## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Timothy Leighton, John Taney, Arlen Orth,
Richard Terry, and William Wallace,
individually and as representatives of a class
of similarly situated persons,

**Case No.**  19-CV-1089

Plaintiffs,

v.

**COMPLAINT**

Delta Air Lines, Inc. and Administrative
Committee of Delta Air Lines, Inc.,

Defendants.

---

## INTRODUCTION

1.   Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a) on behalf of

themselves and similarly situated participants and beneficiaries of the Northwest

Airlines Pension Plan for Contract Employees ("Plan").[1]  Plaintiffs seek to hold

---

[1] Ex. 1.

Delta[2] accountable for its unreasonable and unsupported decision to reduce their pension benefits simply because they suffered injuries and received workers' compensation benefits during their employment.  By reducing Plaintiffs' and similarly situated beneficiaries' pension benefits, Delta abused its discretion under the Plan and breached its fiduciary duties under ERISA.

2. In 2015, Delta began mailing letters to Plaintiffs and other similarly situated Plan participants informing them that it would reduce the monthly pension benefits that they depend on.[3]  During their employment, Plaintiffs received <u>one-time, lump sum</u> payments to settle workers' compensation claims that they had against Delta.  According to Delta, these <u>one-time, lump sum</u> payments, which Plaintiffs received many years ago, constitute *periodic and ongoing* benefits that remain payable to Plaintiffs.  Delta argues that the Plan authorizes it to reduce, or "offset," Plaintiffs' monthly pension benefits by their workers' compensation settlements because it authorizes the reduction of benefits by *periodic* "Workers' Compensation Benefits" that are *payable* to a participant.

3. After mischaracterizing the one-time, lump sum payments that Plaintiffs received years ago as ongoing, periodic, monthly benefits that remain payable,

---

[2] Plaintiffs collectively refer to Delta Air Lines, Inc. and the Administrative Committee of Delta Air Lines, Inc. as "Delta."

[3] <u>See</u> Ex. 2, 3, 4, 5, 6.

Delta proceeded to reduce the monthly pension benefits that Plaintiffs worked for and now rely on to pay their bills.  In fact, Delta even clawed back purported over-payments that it had made before pursuing its interpretation of the Plan's "offset" provision. Delta recouped these "over-payments" by further reducing Plaintiffs' monthly pension benefits.

4.  The Plan provides no authority for Delta to offset the benefits that Plaintiffs and similarly situated beneficiaries are entitled to receive under the Plan.  In fact, its plain language prohibits Delta's actions.

5.  Plaintiffs appealed Delta's wrongful actions to the Administrative Committee.[4] The Administrative Committee abused its discretion by affirming Delta's actions, contrary to the Plan's plain language.[5]  In fact, the Administrative Committee exceeded the bounds of its discretion under ERISA by basing its decision on an interpretation of extraneous documents unrelated to the Plan.

6.  Throughout its decisionmaking process, Delta did not fairly interpret the Plan when choosing to reduce Plaintiffs' pension benefits.  Rather, it selected the outcome that would give the greatest financial benefit to Delta, and only after consulting with the Delta department that had fought against Plaintiffs' recovery

---

[4] See Ex. 7, 8, 9, 10, 11.

[5] See Ex. 12, 13, 14, 15, 16.

of benefits when they were injured on the job.[6]  Delta's unfair decisionmaking

process violated the fiduciary duties that it owed Plaintiffs.

7.  Plaintiffs bring this class action to redress Delta's repeated violations of ERISA,

which have resulted from its systematic failure to pay in full the benefits that are

due and owing to participants and beneficiaries under the terms of the Plan.

**JURISDICTION AND VENUE**

8.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331.

9.  This district is the proper venue for this action and this Court has personal

jurisdiction because it is the district where the alleged breaches took place, where

Delta does business, and where Delta may be found.

**PARTIES**

10. Leighton lives in Apple Valley, Minnesota.  He worked at Northwest Airlines

and Delta in Minnesota for approximately 32 years.  Leighton was an equipment

service employee and baggage handler, and he contributed to the Plan

throughout his entire career.  He is a participant in the Plan within the meaning

of 29 U.S.C. § 1002(7). Leighton is 67 years old.

11. Taney lives in Rosemount, Minnesota.  He worked at Northwest Airlines and

Delta in Minnesota for approximately 34 years.  Taney was a transfer driver and

---

[6] See Ex. 2, 3, 4, 5, 6, 12, 13, 14, 15, 16 (referencing correspondence with Delta's Workers'
Compensation Department).

baggage handler, and he contributed to the Plan throughout his entire career.  He is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7).  Taney is 67 years old.

12. Orth lives in Richfield, Minnesota.  He worked at Northwest Airlines and Delta in Minnesota for approximately 24 years.  Orth was an equipment service employee and baggage handler, and he contributed to the Plan throughout his entire career.  He is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7).  Orth is 68 years old.

13. Terry lives in Burnsville, Minnesota.  He worked at Northwest Airlines and Delta in Minnesota for approximately 19 years.  Terry was an equipment service employee and baggage handler, and he contributed to the Plan throughout his entire career.  He is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7).  Terry is 60 years old.

14. Wallace lives in Burnsville, Minnesota.  He worked at Northwest Airlines and Delta in Minnesota for approximately 29 years.  Wallace was a stock clerk and equipment service employee, and he contributed to the Plan throughout his entire career.  He is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Wallace is 67 years old.

15. Delta is the second largest airline in the world. It is incorporated in Delaware with headquarters in Atlanta and substantial operations in Minnesota.  Delta,

along with its subsidiaries and affiliates, operates over 5,000 flights daily and serves an extensive domestic and international network with over 300 destinations on 6 continents.  In 2008, Delta merged with Northwest Airlines and assumed Northwest's obligations with respect to the Plan.  Delta's employees include technicians, mechanics, baggage handlers, flight attendants, dispatchers, laborers, support staff, administrators, and others who rely on the Plan for their retirement income.

16. Delta is the sponsor of the Plan under 29 U.S.C. §1002(16)(B), an administrator of the Plan under 29 U.S.C. §1002(16)(A), a party in interest to the Plan under 29 U.S.C. §1002(14), and a named fiduciary under 29 U.S.C. § 1102(a)(2).

17. The Administrative Committee is an administrator of the Plan under 29 U.S.C. §1002(16)(A) and a named fiduciary under 29 U.S.C. § 1102(a)(2).

18. Pursuant to 29 U.S.C. § 1002(21), Delta and the Administrative Committee are fiduciaries under the Plan because they exercise discretionary authority or discretionary control regarding management of the Plan, exercise authority or control respecting management or disposition of the Plan's assets, and have discretionary authority or discretionary responsibility in the administration of the Plan.

## FACTS

### Northwest Airlines Pension Plan for Contract Employees

19.  Plaintiffs and similarly situated persons worked at Northwest Airlines before its merger with Delta.  They contributed to the Plan throughout their employment and counted on its guarantees of defined income benefits for their retirement.

20. The Plan is an "employee pension benefit plan" under 29 U.S.C. §1002(2)(A) and a "defined benefit plan" under 29 U.S.C. §1002(35).

21. In 2017, the Plan consisted of approximately 11,562 active participants, and held approximately $3.3 billion in total assets.

22. The Plan provides that, when they retire, participants receive defined monthly benefits, calculated by multiplying their years of service by a monthly dollar amount associated with their job classification.[7]  The defined monthly value is a participant's Accrued Benefit.[8]

23. Participants are eligible for Normal Retirement Benefits if they retire at age 65 or older and have participated in the Plan for at least 5 years.

24. Participants are eligible for Early Retirement Benefits if they retire at age 55 or older and have completed at least 10 years of Vesting Service in the Plan.  An

---

[7] See Ex. 17 at 8.

[8] See Ex. 1 at ¶ 1.2.2.

early-retirement participant may have a lower Accrued Benefit, depending on his or her age at the time of retirement.[9]

25. The Plan narrowly and precisely defines "Workers' Compensation Benefits" as follows:

> 1.2.32.    **Workers' Compensation Benefits** — any periodic benefits payable to a Participant: (i) as compensation for a personal injury (including any occupational disease) arising out of and in the course of employment for the Employer, and (ii) with respect to a period of time after the Participant has attained age sixty-five (65) years, and (iii) in accordance with a statute such as a workers' compensation or similar law (whether applicable by its own terms or by reason of an agreement between the Employer and the union representing the Participant), and (iv) as compensation for lost income or earnings (rather than as compensation for the loss of the function or use of a bodily member or other bodily function). The amount of the "Workers' Compensation Benefits" payable to the Participant shall be determined and redetermined from time to time to take into account the commencement, discontinuance, increase or decrease of such benefits.[10]

26. This definition limits the meaning of Workers' Compensation Benefits to "periodic" benefits that are "payable" to a participant.  It further makes clear that the amount of Workers' Compensation Benefits "payable" to the participant "shall be determined and redetermined from time to time to take into account the commencement, discontinuance, increase or decrease of such benefits."

27. The Plan expressly provides that any time the term "Workers' Compensation Benefits" is used in the Plan, it "shall" have the meaning assigned to it in Section 1.2.32.[11]  The Plan prohibits Delta from deviating from the Plan's definition.

---

[9] See Ex. 17 at 13-14.

[10] See Ex. 1 at ¶ 1.2.32.

[11] Id. at ¶ 1.2 ("**Definitions.** As used herein, the following terms shall have the following meanings").

28. The Plan incorporates its definition of Workers' Compensation Benefits into the Normal and Early Retirement Pension provisions.

29. For Normal Retirement Pensions, the Plan accounts for participants that simultaneously receive monthly pension benefits and monthly Workers' Compensation Benefits by capping participants' total monthly benefits (pension benefits plus Workers' Compensation Benefits) at the value of the Accrued Benefit.  To accomplish this, the Plan provides that participants' total monthly benefits "shall be such that together with Workers' Compensation Benefits, if any, it will be the amount of the Participant's Accrued Benefit."  In other words, a normal-retirement participant entitled to monthly pension benefits and monthly Workers' Compensation Benefits will receive total monthly benefits corresponding to the Accrued Benefit only – not the Accrued Benefit plus Workers' Compensation Benefits.[12]

30. The Plan creates a similar framework for Early Retirement Pensions.  When early-retirement participants simultaneously receive monthly pension benefits and monthly Workers' Compensation Benefits, the Plan provides that the participants' total monthly benefits "shall be the amount of the Participant's Accrued Benefit determined as of the Participant's Termination of Employment

---

[12] See id. at ¶ 3.1.2.

9

. . . . Provided, however, that monthly payments of the Early Retirement Pension payable after the Participant attains age sixty-five (65) years shall be reduced by the Workers' Compensation Benefits, if any, received by the Participant." Like with the Normal Retirement Pension, this provision guarantees that, when an early-retirement participant reaches age 65, the participant's total monthly benefits will equal the Accrued Benefit only. If the participant receives monthly pension benefits and monthly Workers' Compensation Benefits, the monthly pension benefits will be reduced so that the total monthly benefits (monthly pension benefits plus Workers' Compensation Benefits) are no greater and no less than the Accrued Benefit. [13]

**Delta improperly reduced benefits to Plaintiffs and similarly situated participants.**

### *Timothy Leighton*

31. On October 29, 2009, Leighton suffered a work injury while working for Delta. At the time, he made $753.46 per week. Delta contested his workers' compensation claim and the parties ultimately settled on January 14, 2014 for a lump sum payment of $65,000.[14] In the Workers' Compensation Settlement Agreement, Leighton and Delta agreed that "it is the express intention of the

---

[13] See id. at ¶ 3.2.2.

[14] Ex. 18 at 3.

parties, by and through this Stipulation for Settlement, to fully, finally and completely settle all claims (past, present and future) the employee has or may have for all Minnesota workers' compensation benefits."[15]

32. Leighton's workers' compensation settlement was paid entirely, or in substantial part, by ACE American Insurance Company.[16]

33. On July 30, 2011, Leighton retired from Delta at age 60. Per the terms of the Plan, he began receiving monthly pension benefits in the gross amount of $1,090.37.

34. On July 15, 2016, Delta mailed Leighton a letter stating that it would reduce his monthly pension benefits by $225.81 to $864.56 for the next 17 years. It further stated that it would recoup purported overpayments resulting from its failure to reduce pension benefits that Leighton had already received. In an effort to justify the radical reduction, Delta broke down Leighton's one-time, lump sum workers' compensation payment from 2014 into monthly wage-loss benefits extended over 19 years of life expectancy. By doing so, it re-characterized Leighton's lump sum settlement as continuing payments of $225.81 per month

---

[15] Id. at 6.

[16] Id. at 3.

and claimed that the Plan authorized it to subtract that amount from his monthly

pension benefits.[17]

35. The Plan provides no authority or basis for Delta's actions.  In fact, its explicit

language defining Workers' Compensation Benefits as "periodic" benefits

"payable" to participants that "shall be redetermined from time to time to take

into account the commencement, discontinuance, increase, or decrease of such

benefits" prohibits Delta's reduction given that:

    a.  "periodic" is the opposite of a one-time, lump sum;

    b.  "payable" is the opposite of paid; and

    c.  Leighton's workers' compensation benefits explicitly "discontinu[ed]" on

       January 14, 2014, yet Delta didn't "take into account" the

       "discontinuance" of these benefits when reducing Leighton's pension

       benefits.  Leighton's receipt of the one-time, lump sum payment

       "discontinu[ed]" his entitlement to any further payment of workers'

       compensation benefits, well before he reached age 65. Under the terms of

       the Plan, Delta *shall* take that discontinuance into account – it provides no

       authority to reduce Leighton's pension benefits based on discontinued

       workers' compensation benefits.

---

[17] Ex. 2.

36. Lacking support in the Plan's language, Delta looked outside the Plan to justify its actions.  In its letter to Leighton, it stated: "Per the Workers' Compensation Department, $52,000 of your total lump sum settlement was due to loss of wages and represented future Workers' Compensation benefits payable for a life expectancy of 19.19 years."[18]  Delta's reference to the terms of Leighton's settlement indicates that it based its decision to reduce Leighton's pension benefits on the Workers' Compensation Department's interpretation of his Workers' Compensation Settlement Agreement.

37. Nothing in Leighton's Workers' Compensation Settlement Agreement purports to modify, alter, or amend any part of the Plan.  Indeed, Leighton's Workers' Compensation Settlement Agreement doesn't even reference the Plan.  Nothing in Leighton's Workers' Compensation Settlement Agreement purports to define "Workers' Compensation Benefits" as used in the Plan, nor does it purport to define "periodic" or "payable."[19]

38. Perhaps more importantly, nothing in either the Plan or Leighton's Workers' Compensation Settlement Agreement empowers Delta or the Administrative Committee to interpret the Settlement Agreement.  While the Administrative

---

[18] Id.

[19] See Ex. 18, passim.

Committee has discretionary authority to interpret the Plan's language, it enjoys no such discretion to interpret documents, like the Settlement Agreement, that are unrelated to the Plan.

39. Nonetheless, Delta relied on its "Workers' Compensation Department" to interpret language in Leighton's Settlement Agreement, which stated that "the net lump sum of $52,000 . . . represents a payment of $225.81 per month."[20]

40. Delta's Workers' Compensation Department has an adverse interest to Plan participants, like Plaintiffs, that are or were involved in contested workers' compensation proceedings.

41. Despite the Workers' Compensation Department's adverse interest, Delta relied on its guidance when expanding the Plan's definition of Workers' Compensation Benefits to include a one-time, lump sum payment that was no longer payable. The Administrative Committee also relied on the Workers' Compensation Department's guidance, and interpreted the Settlement Agreement, when affirming Delta's wrongful reduction of Leighton's monthly pension benefits.[21]

42. In fact, contrary to Delta's unauthorized interpretation, the Workers' Compensation Settlement Agreement calculates the per month value of

---

[20] Id. at 5.

[21] Ex. 12.

Leighton's one-time, lump sum settlement for the sole purpose of determining the settlement's impact on any corresponding disability payments. Indeed, state and federal disability statutes are the only authorities referenced in connection with the calculation – there is no mention of the Plan.[22]  Even more plainly, it was Delta's position during the workers' compensation proceedings that Leighton "**is not entitled to ongoing workers' compensation benefits** relative to the work-related injury."[23]

43. Delta's prior interpretations of the Plan stuck to the Plan's plain language.  A prior Summary Plan Description ("SPD") states that Workers' Compensation Benefits "are determined from time to time so that as the amount of the benefits change, *the effect on your pension also changes*."[24]  The SPD also states that "[b]enefits payable to you before you are age 65 are disregarded."[25]  Leighton received his one-time, lump sum payment of workers' compensation benefits before he reached age 65 and his "amount of benefits" discontinued upon his receipt of that payment.  *All* of his workers' compensation benefits were paid before he reached age 65.

---

[22] Ex. 18 at 5.

[23] Id. at 3 (emphasis added).

[24] Ex. 23 at 9 (emphasis added).

[25] Id.

44. Delta's inconsistent interpretations of the Plan further indicate that its current

interpretation is an unreasonable abuse of discretion.

45. Delta continues to reduce Leighton's monthly pension benefits to this day.

### *John Taney*

46. On November 8, 2010, Taney suffered a work injury while working for Delta.

Delta contested his workers' compensation claim and the parties ultimately

settled on September 20, 2012 for a lump sum payment of $80,000.[26]  In the

Workers' Compensation Settlement Agreement, Delta made clear that "[t]he

employee's future wage loss claims will be due to his retirement rather than the

effects of the work-related injury."[27]  Delta further represented that it was

"desirous of settling his claims on a full, final and complete basis."[28]  Taney and

Delta agreed that "the employer and insurer shall pay, and the employee shall

accept, the sum of $80,000 for a full, final and complete settlement of any and all

workers' compensation claims the employee has or may have against the

employer."[29]

---

[26] Ex. 19 at 3.

[27] Id.

[28] Id.

[29] Id.

47. Taney's workers' compensation settlement was paid entirely, or in substantial part, by ACE American Insurance Company.[30]

48. On September 1, 2012, Taney retired from Delta at age 60.  Per the terms of the Plan, he began receiving monthly pension benefits in the gross amount of $1,169.10.

49. On November 3, 2017, Delta mailed Taney a letter stating that it would reduce his monthly pension benefits by $246.02 to $923.08 for the next 17 years.  Delta further stated that it would recoup purported overpayments resulting from its failure to reduce pension benefits that Taney had already received.  In an effort to justify the radical reduction, Delta broke down Taney's one-time, lump sum workers' compensation payment from 2012 into monthly wage-loss benefits extended over 21 years of life expectancy. By doing so, it re-characterized Taney's lump sum settlement as continuing payments of $246.02 per month and claimed that the Plan authorized it to subtract that amount from his monthly pension benefits.[31]

50. The Plan provides no authority or basis for Delta's actions.  In fact, its explicit language defining Workers' Compensation Benefits as "periodic" benefits

---

[30] Id. at 3.

[31] Ex. 3.

"payable" to participants that "shall be redetermined from time to time to take into account the commencement, discontinuance, increase, or decrease of such benefits" prohibits Delta's reduction given that:

    a.  "periodic" is the opposite of a one-time, lump sum;

    b.  "payable" is the opposite of paid; and

    c.  Taney's workers' compensation benefits explicitly "discontinu[ed]" on September 20, 2012, yet Delta didn't "take into account" the "discontinuance" of these benefits when reducing Taney's pension benefits.  Taney's receipt of the one-time, lump sum payment "discontinu[ed]" his entitlement to any further payment of workers' compensation benefits, well before he reached age 65. Under the terms of the Plan, Delta *shall* take that discontinuance into account – it provides no authority to reduce Taney's pension benefits based on discontinued workers' compensation benefits.

51. Lacking support in the Plan's language, Delta looked outside the Plan to justify its actions. In its letter to Taney, it stated: "Per the Workers' Compensation Department, $63,800 of your total lump sum settlement was due to loss of wages and represented future Workers' Compensation benefits payable for a life

expectancy of 21.61 years."[32]  Delta's reference to the terms of Taney's settlement indicates that it based its decision to reduce Taney's pension benefits on the Workers' Compensation Department's interpretation of his Workers' Compensation Settlement Agreement.

52. Nothing in Taney's Workers' Compensation Settlement Agreement purports to modify, alter, or amend any part of the Plan.  Indeed, Taney's Workers' Compensation Settlement Agreement doesn't even reference the Plan.  Nothing in Taney's Workers' Compensation Settlement Agreement purports to define "Workers' Compensation Benefits" as used in the Plan, nor does it purport to define "periodic" or "payable."[33]

53. Perhaps more importantly, nothing in either the Plan or Taney's Workers' Compensation Settlement Agreement empowers Delta or the Administrative Committee to interpret the Settlement Agreement.  While the Administrative Committee has discretionary authority to interpret the Plan's language, it enjoys no such discretion to interpret documents, like the Settlement Agreement, that are unrelated to the Plan.

---

[32] Id.

[33] See Ex. 19, passim.

54. Nonetheless, Delta relied on its "Workers' Compensation Department" to interpret language in Taney's Settlement Agreement, which stated that the $63,800 lump sum "is intended to compensate the employee over the employee's life expectancy . . . . [and] represents a payment of $246.02 per month."[34]

55. Delta's Workers' Compensation Department has an adverse interest to Plan participants, like Plaintiffs, that are or were involved in contested workers' compensation proceedings.

56. Despite the Workers' Compensation Department's adverse interest, Delta relied on its guidance when expanding the Plan's definition of Workers' Compensation Benefits to include a prior one-time, lump sum payment that was no longer payable. The Administrative Committee also relied on the Workers' Compensation Department's guidance, and interpreted the Settlement Agreement, when affirming Delta's wrongful reduction of Taney's monthly pension benefits.[35]

57. In fact, the Workers' Compensation Settlement Agreement calculates the per month value of Taney's one-time, lump sum settlement for the sole purpose of determining the settlement's impact on any corresponding disability payments.

---

[34] Id. at 5.

[35] Ex. 13.

Indeed, state and federal disability statutes are the only authorities referenced in connection with the calculation – there is no mention of the Plan.[36]

58. Delta's prior interpretations of the Plan stuck to the Plan's plain language. A prior Summary Plan Description ("SPD") states that Workers' Compensation Benefits "are determined from time to time so that as the amount of the benefits change, *the effect on your pension also changes*."[37] The SPD also states that "[b]enefits payable to you before you are age 65 are disregarded."[38] Taney received his one-time, lump sum payment of workers' compensation benefits before he reached age 65 and his "amount of benefits" discontinued upon his receipt of that payment. *All* of his workers' compensation benefits were paid before he reached age 65.

59. Delta's inconsistent interpretations of the Plan further indicate that its current interpretation is an unreasonable abuse of discretion.

60. Delta continues to reduce Taney's monthly pension benefits to this day.

---

[36] Ex. 19 at 5.

[37] Ex. 23 at 9 (emphasis added).

[38] Id.

*Arlen Orth*

61. On January 12, 1999, Orth suffered a work injury while working for Northwest. At the time, he made $718.55 per week.  He became permanently disabled from working as of September 11, 2009.[39]  Northwest and Delta contested his workers' compensation claim and the parties ultimately settled on June 27, 2011 for a lump sum payment of $50,000.[40]  In the Workers' Compensation Settlement Agreement, Orth and Delta agreed that "[t]he employer and insurer shall pay, and the employee shall accept, the sum of $50,000 for a full, final and complete settlement of any and all workers' compensation claims the employee has or may have against the employer."[41]  The Settlement Agreement provided that "[the employee] further understands that if he has sustained other injuries that he is closing those claims out on a full, final and complete basis for all claims."[42] The parties further agreed:

> [W]hen the above payments have been made, it is the express intention of the parties, by and through this Stipulation for Settlement, to fully, finally and completely settle all claims (past, present and future) the employee has or may have for all

---

[39] Ex. 21 at 2.

[40] Id. at 4.

[41] Id.

[42] Id. at 5 (emphasis added).

Minnesota workers' compensation benefits including but not
limited to . . . any and all other workers' compensation benefits.[43]

62. Orth's workers' compensation settlement was paid entirely, or in substantial

part, by Liberty Mutual Insurance Company.[44]

63. On March 16, 2011, Orth retired from Delta at age 59.  Per the terms of the Plan,

he began receiving monthly pension benefits in the gross amount of $1,057.15.

64. On January 29, 2015, Delta mailed Orth a letter stating that it would reduce his

monthly pension benefits by $79.29 to $977.86 for the next 16 years.  In an effort

to justify the radical reduction, Delta broke down Orth's one-time, lump sum

workers' compensation payment from 2011 into monthly wage-loss benefits

extended over 21 years of life expectancy.  By doing so, it re-characterized Orth's

lump sum settlement as a continuing payment of $79.29 per month and claimed

that the Plan authorized it to subtract that amount from his monthly pension

benefits.[45]

65. The Plan provides no authority or basis for Delta's actions.  In fact, its explicit

language defining Workers' Compensation Benefits as "periodic" benefits

"payable" to participants that "shall be redetermined from time to time to take

---

[43] Id. at 7.

[44] Id. at 4.

[45] Ex. 5.

into account the commencement, discontinuance, increase, or decrease of such benefits" prohibits Delta's reduction given that:

    a.  "periodic" is the opposite of a one-time, lump sum;

    b.  "payable" is the opposite of paid; and

    c.  Orth's workers' compensation benefits explicitly "discontinu[ed]" on June 27, 2011, yet Delta didn't "take into account" the "discontinuance" of these benefits when reducing Orth's pension benefits.  Orth's receipt of the one-time, lump sum payment "discontinu[ed]" his entitlement to any further payment of workers' compensation benefits, well before he reached age 65. Under the terms of the Plan, Delta *shall* take that discontinuance into account – it provides no authority to reduce Orth's pension benefits based on discontinued workers' compensation benefits.

66. Lacking support in the Plan's language, Delta looked outside the Plan to justify its actions. In its letter to Orth, it stated: "Per the Workers' Compensation Department, $19,800 of this lump sum settlement was due to loss of wages and represented a future Workers' Compensation benefit of $79.29 per month payable for 20.81 years."[46]  Delta's reference to the terms of Orth's settlement indicates that it based its decision to reduce Orth's pension benefits on the

---

[46] Id.

Workers' Compensation Department's interpretation of his Workers'

Compensation Settlement Agreement.

67. Nothing in Orth's Workers' Compensation Settlement Agreement purports to

modify, alter, or amend any part of the Plan.  Indeed, Orth's Workers'

Compensation Settlement Agreement doesn't even reference the Plan.  Nothing

in Orth's Workers' Compensation Settlement Agreement purports to define

"Workers' Compensation Benefits" as used in the Plan, nor does it purport to

define "periodic" or "payable."[47]

68. Perhaps more importantly, nothing in either the Plan or Orth's Workers'

Compensation Settlement Agreement empowers Delta or the Administrative

Committee to interpret the Settlement Agreement.  While the Administrative

Committee has discretionary authority to interpret the Plan's language, it enjoys

no such discretion to interpret documents, like the Settlement Agreement, that

are unrelated to the Plan.

69. Nonetheless, Delta relied on its "Workers' Compensation Department" to

interpret language in Orth's Settlement Agreement, which stated that the lump

---

[47] See Ex. 21, passim.

sum of "$19,800 is intended to compensate the employee over the employee's life expectancy . . . . [and] represents a payment of $79.29 per month."[48]

70. Delta's Workers' Compensation Department has an adverse interest to Plan participants, like Plaintiffs, that are or were involved in contested workers' compensation proceedings.

71. Despite the Workers' Compensation Department's adverse interest, Delta relied on its guidance when expanding the Plan's definition of Workers' Compensation Benefits to include a prior one-time, lump sum payment that was no longer payable. The Administrative Committee also relied on the Workers' Compensation Department's guidance, and interpreted the Settlement Agreement, when affirming Delta's wrongful reduction of Orth's monthly pension benefits.[49]

72. In fact, the Workers' Compensation Settlement Agreement calculates the per month value of Orth's one-time, lump sum settlement for the sole purpose of determining the settlement's impact on any corresponding disability payments. Indeed, state and federal disability statutes are the only authorities referenced in

---

[48] Id. at 5-6.

[49] Ex. 15.

connection with the calculation – there is no mention of the Plan.[50] Even more plainly, during the workers' compensation proceedings, Delta contended that it was entitled to an offset of Orth's disability benefits, but it made no similar contention regarding any offset of Orth's pension benefits.[51]

73. Delta's prior interpretations of the Plan stuck to the Plan's plain language.  A prior Summary Plan Description ("SPD") states that Workers' Compensation Benefits "are determined from time to time so that as the amount of the benefits change, *the effect on your pension also changes*."[52]  The SPD also states that "[b]enefits payable to you before you are age 65 are disregarded."[53]  Orth received his one-time, lump sum payment of workers' compensation benefits before he reached age 65 and his "amount of benefits" discontinued upon his receipt of that payment.  *All* of his workers' compensation benefits were paid before he reached age 65.

74. Delta's inconsistent interpretations of the Plan further indicate that its current interpretation is an unreasonable abuse of discretion.

75. Delta continues to reduce Orth's monthly pension benefits to this day.

---

[50] Ex. 21 at 5-6.

[51] Id. at 3.

[52] Ex. 23 at 9 (emphasis added).

[53] Id.

*Richard Terry*

76. On July 13, 2013, Terry suffered a work injury while working for Delta. At the time, he made $1,060.74 per week.  Delta contested his workers' compensation claim and the parties ultimately settled on April 14, 2016 for "the lump sum payment of $110,000."[54]  The Workers' Compensation Settlement Agreement reflected that the parties were "desirous of settling the employee's claims on a full, final and complete basis for all workers' compensation claims."[55]  Terry and Delta agreed that "the employer and insurer shall pay, and the employee shall accept, the sum of $110,000 for a full, final and complete settlement of any and all workers' compensation claims the employee has or may have against the employer."[56]  The Settlement Agreement provided that the employee "agrees and understands that he is closing out any and all claims for workers' compensation benefits he has or may have against Delta."[57] The parties further agreed:

> [W]hen the above payments have been made, it is the express intention of the parties, by and through this Stipulation for Settlement, to fully, finally and completely settle all claims (past, present and future) the employee has or may have for all

---

[54] Ex. 20 at 4.

[55] <u>Id.</u> at 3.

[56] <u>Id.</u> at 4.

[57] <u>Id.</u> at 6.

Minnesota workers' compensation benefits including but not limited to . . . any and all other workers' compensation benefits.[58]

77. Terry's workers' compensation settlement was paid entirely, or in substantial part, by Sedgwick Claims Management Services.[59]

78. On April 1, 2016, Terry retired from Delta at age 57, but he opted – per the Plan's terms – to delay commencement of his pension benefits.

79. On January 16, 2017, Delta mailed Terry a letter stating that "[a]t such time that you do commence your benefit, we are advising you that a Workers' Compensation offset of $314.70 will be applied to your monthly age 65 Single Life Benefit under the Contract Plan for pension payments from April 30, 2024 through May 31, 2039."[60]  In an effort to justify the radical reduction to Terry's expected benefits, Delta broke down Terry's one-time, lump sum workers' compensation payment from 2016 into monthly wage-loss benefits extended over 23 years of life expectancy.  By doing so, it re-characterized Terry's lump sum settlement as a continuing payment of $314.70 per month and claimed that the Plan authorized it to subtract that amount from his monthly pension benefits.[61]

---

[58] Id.

[59] Id. at 4.

[60] Ex. 4.

[61] Id.

80. The Plan provides no authority or basis for Delta's actions.  In fact, its explicit language defining Workers' Compensation Benefits as "periodic" benefits "payable" to participants that "shall be redetermined from time to time to take into account the commencement, discontinuance, increase, or decrease of such benefits" prohibits Delta's reduction given that:

    a. "periodic" is the opposite of a one-time, lump sum;

    b. "payable" is the opposite of paid; and

    c. Terry's workers' compensation benefits explicitly "discontinu[ed]" on April 14, 2016, yet Delta didn't "take into account" the "discontinuance" of these benefits when reducing Terry's pension benefits.  Terry's receipt of the one-time, lump sum payment "discontinu[ed]" his entitlement to any further payment of workers' compensation benefits, well before he reached age 65. Under the terms of the Plan, Delta *shall* take that discontinuance into account – it provides no authority to reduce Terry's pension benefits based on discontinued workers' compensation benefits.

81. Lacking support in the Plan's language, Delta looked outside the Plan to justify its actions. In its letter to Terry, it stated: "Per the Workers' Compensation Department, $87,800 of this lump sum was due to loss of wages and represented a future Workers' Compensation benefit of $314.70 per month payable for 23.25

30

years."[62] Delta's reference to the terms of Terry's settlement indicates that it based its decision to reduce Terry's pension benefits on the Workers' Compensation Department's interpretation of his Workers' Compensation Settlement Agreement.

82. Nothing in Terry's Workers' Compensation Settlement Agreement purports to modify, alter, or amend any part of the Plan.  Indeed, Terry's Workers' Compensation Settlement Agreement doesn't even reference the Plan.  Nothing in Terry's Workers' Compensation Settlement Agreement purports to define "Workers' Compensation Benefits" as used in the Plan, nor does it purport to define "periodic" or "payable."[63]

83. Perhaps more importantly, nothing in either the Plan or Terry's Workers' Compensation Settlement Agreement empowers Delta or the Administrative Committee to interpret the Settlement Agreement.  While the Administrative Committee has discretionary authority to interpret the Plan's language, it enjoys no such discretion to interpret documents, like the Settlement Agreement, that are unrelated to the Plan.

---

[62] Id.

[63] See Ex. 20, passim.

84. Nonetheless, Delta relied on its "Workers' Compensation Department" to interpret the language in Terry's Settlement Agreement, which stated that the $87,800 lump sum "is intended to compensate the employee over the employee's life expectancy . . . . [and] represents a payment of $314.70 per month."[64]

85. Delta's Workers' Compensation Department has an adverse interest to Plan participants, like Plaintiffs, that are or were involved in contested workers' compensation proceedings.

86. Despite the Workers' Compensation Department's adverse interest, Delta relied on its guidance when expanding the Plan's definition of Workers' Compensation Benefits to include a prior one-time, lump sum payment that was no longer payable. The Administrative Committee also relied on the Workers' Compensation Department's guidance, and interpreted the Settlement Agreement, when affirming Delta's wrongful reduction of Terry's monthly pension benefits.[65]

87. In fact, the Workers' Compensation Settlement Agreement calculates the per month value of Terry's one-time, lump sum settlement for the sole purpose of determining the settlement's impact on any corresponding disability payments.

---

[64] Id. at 5.

[65] Ex. 14.

Indeed, state and federal disability statutes are the only authorities referenced in connection with the calculation – there is no mention of the Plan.[66]

88. Delta's prior interpretations of the Plan stuck to the Plan's plain language.  A prior Summary Plan Description ("SPD") states that Workers' Compensation Benefits "are determined from time to time so that as the amount of the benefits change, *the effect on your pension also changes*."[67]  The SPD also states that "[b]enefits payable to you before you are age 65 are disregarded."[68]  Terry received his one-time, lump sum payment of workers' compensation benefits before he reached age 65 and his "amount of benefits" discontinued upon his receipt of that payment.  *All* of his workers' compensation benefits were paid before he reached age 65.

89. Delta's inconsistent interpretations of the Plan further indicate that its current interpretation is an unreasonable abuse of discretion.

### William Wallace

90. On October 25, 2002, December 7, 2004, January 9, 2006, October 10, 2007, and March 25, 2009, Wallace suffered work injuries while working for Northwest and

---

[66] Ex. 20 at 5-6.

[67] Ex. 23 at 9 (emphasis added).

[68] <u>Id.</u>

Delta.  His weekly wage as of his last injury was $877.06.  Delta contested his workers' compensation claim and the parties ultimately settled on December 21, 2009 for a lump sum payment of $65,000.[69]  Per the Settlement Agreement, "the employee agrees to accept the foregoing sums as a full, final, and complete settlement of any and all claims, past, present, and future, that he may have under the Workers' Compensation Act . . . including, but not limited to . . . any and all other claims the employee may have arising out of any injury."[70]

91. Wallace's workers' compensation settlement was paid entirely, or in substantial part, by Liberty Mutual Insurance Company.[71]

92. On August 31, 2010, Wallace retired from Delta at age 58.  Per the terms of the Plan, he began receiving monthly pension benefits in the gross amount of $1,065.

93. On November 9, 2016, Delta mailed Wallace a letter stating that it would reduce his monthly pension benefits by $160.72 to $904.28 for the next 16 years.  In an effort to justify the radical reduction, Delta broke down Wallace's one-time, lump sum workers' compensation payment from 2009 into monthly wage-loss benefits extended over 22 years of life expectancy. By doing so, it re-characterized

---

[69] Ex. 22 at 7.

[70] Id. at 7-8.

[71] Id. at 7.

Wallace's lump sum settlement as a continuing payment of $160.72 per month and claimed that the Plan authorized it to subtract that amount from his monthly pension benefits.[72]

94. The Plan provides no authority or basis for Delta's actions.  In fact, its explicit language defining Workers' Compensation Benefits as "periodic" benefits "payable" to participants that "shall be redetermined from time to time to take into account the commencement, discontinuance, increase, or decrease of such benefits" prohibits Delta's reduction given that:

    a.   "periodic" is the opposite of a one-time, lump sum;

    b.   "payable" is the opposite of paid; and

    c.   Wallace's workers' compensation benefits explicitly "discontinu[ed]" on December 21, 2009, yet Delta didn't "take into account" the "discontinuance" of these benefits when reducing Wallace's pension benefits.  Wallace's receipt of the one-time, lump sum payment "discontinu[ed]" his entitlement to any further payment of workers' compensation benefits, well before he reached age 65. Under the terms of the Plan, Delta *shall* take that discontinuance into account – it provides no

---

[72] Ex. 6.

authority to reduce Wallace's pension benefits based on discontinued workers' compensation benefits.

95. Lacking support in the Plan's language, Delta looked outside the Plan to justify its actions. In its letter to Wallace, it stated: "Per the Workers' Compensation Department, $43,258.12 of this lump sum settlement was due to loss of wages and represented a future Workers' Compensation benefit of $160.72 per month based on a life expectancy of 22.43 years."[73]  Delta's reference to the terms of Wallace's settlement indicates that it based its decision to reduce Wallace's pension benefits on the Workers' Compensation Department's interpretation of his Workers' Compensation Settlement Agreement.

96. Nothing in Wallace's Workers' Compensation Settlement Agreement purports to modify, alter, or amend any part of the Plan.  Indeed, Wallace's Workers' Compensation Settlement Agreement doesn't even reference the Plan.  Nothing in Wallace's Workers' Compensation Settlement Agreement purports to define "Workers' Compensation Benefits" as used in the Plan, nor does it purport to define "periodic" or "payable."[74]

---

[73] Id.

[74] See Ex. 22, passim.

36

97. Perhaps more importantly, nothing in either the Plan or Wallace's Workers' Compensation Settlement Agreement empowers Delta or the Administrative Committee to interpret the Settlement Agreement. While the Administrative Committee has discretionary authority to interpret the Plan's language, it enjoys no such discretion to interpret documents, like the Settlement Agreement, that are unrelated to the Plan.

98. Nonetheless, Delta relied on its "Workers' Compensation Department" to interpret the language in Wallace's Settlement Agreement, which stated that "[t]he balance of $43,258.12 . . . . represents payments in the amount of $160.72 per month."[75]

99. Delta's Workers' Compensation Department has an adverse interest to Plan participants, like Plaintiffs, that are or were involved in contested workers' compensation proceedings.

100.     Despite the Workers' Compensation Department's adverse interest, Delta relied on its guidance when expanding the Plan's definition of Workers' Compensation Benefits to include a prior one-time, lump sum payment that was no longer payable. The Administrative Committee also relied on the Workers' Compensation Department's guidance, and interpreted the Settlement

---

[75] Id. at 10-11.

Agreement, when affirming Delta's wrongful reduction to Wallace's monthly

pension benefits.[76]

101.     In fact, the Workers' Compensation Settlement Agreement calculates the

per month value of Wallace's one-time, lump sum settlement for the sole

purpose of determining the settlement's impact on any corresponding disability

payments. Indeed, state and federal disability statutes are the only authorities

referenced in connection with the calculation – there is no mention of the Plan.[77]

102.     Delta's prior interpretations of the Plan stuck to the Plan's plain language.

A prior Summary Plan Description ("SPD") states that Workers' Compensation

Benefits "are determined from time to time so that as the amount of the benefits

change, *the effect on your pension also changes*."[78]   The SPD also states that

"[b]enefits payable to you before you are age 65 are disregarded."[79]   Wallace

received his one-time, lump sum payment of workers' compensation benefits

before he reached age 65 and his "amount of benefits" discontinued upon his

receipt of that payment.   *All* of his workers' compensation benefits were paid

before he reached age 65.

---

[76] Ex. 16.

[77] Ex. 22 at 10-11.

[78] Ex. 23 at 9 (emphasis added).

[79] Id.

103.     Delta's inconsistent interpretations of the Plan further indicate that its current interpretation is an unreasonable abuse of discretion.

104.     Delta continues to reduce Wallace's monthly pension benefits to this day.

**When Delta negotiated workers' compensation settlements to impact Plan benefits, it made the impact explicitly clear in the settlement documents.**

105.     When it wants to negotiate settlements to impact Plan benefits, Delta knows how to do so.  In some cases – not involving Plaintiffs or similarly situated class members – Delta **explicitly incorporated** the Plan into workers' compensation settlement agreements.  For example, Delta incorporated the Plan into the following workers' compensation settlement agreement:

> The above payments represent payment by Delta Airlines and some payments have been made based upon injuries at prior employers.   Of the payment made under this settlement agreement, 64% represents payments made by Delta Airlines and, therefore, $283.74 represents the monthly payment of compensation for a personal injury arising out of and in the course of employment with the employer as defined in the Northwest Airlines Pension Plan for Contract Employees.[80]

106.     Delta's failure to incorporate or even mention the Plan when settling workers' compensation cases with Plaintiffs and similarly situated class members – despite its documented history of doing so in other workers' compensation

---

[80] See Ex. 24 at 8.

cases – makes clear that the settlements agreed to by Delta and Plaintiffs (and similarly situated class members) intentionally did not modify or purport to modify the Plan's terms or benefits. The settlement agreements had no impact on the Plan whatsoever, and they provide no evidence to support Delta's reduction of Plaintiffs' pension benefits.

107.    Delta's reliance on settlement agreements that contain no reference to the Plan speaks to its unreasonable and unsupported interpretation of the Plan to deprive Plaintiffs and similarly situated class members of their earned benefits.

**Delta does not have discretionary authority to interpret workers' compensation settlement agreements.**

108.    The Plan does not grant discretionary authority for Delta to interpret workers' compensation settlement agreements.

109.    Given its lack of discretionary authority to interpret workers' compensation settlement agreements, Delta's decision to deny Plaintiffs' benefits on the basis of those agreements is not entitled to any discretion. Its interpretation must be reviewed *de novo*.[81]

110.    And the Court can easily conclude that Delta's interpretation of Plaintiffs' workers' compensation settlement agreements was wrong – as a matter of fact and law. As a matter of fact, nothing in Plaintiffs' workers' compensation

---

[81] See Hannington v. Sun Life & Health Ins. Co., 711 F.3d 226, 230 (1st Cir. 2013).

settlement agreements incorporated, modified, purported to modify, or even referenced the Plan, or the Plan's definition of Workers' Compensation Benefits. As a matter of law, the settlement agreements' explicit reference to full and final payment of Plaintiffs' workers' compensation claims – via a one-time, lump sum payment – conclusively forecloses Delta's contentions that Plaintiffs' benefits are actually periodic, payable, and continuing benefits.

**Delta's interpretation of the Plan constitutes an abuse of discretion.**

111.     The Plan affords Delta "the discretionary authority to interpret the Plan Statement."[82]

112.     However, nothing in the Plan grants Delta authority to unilaterally change the meaning of its terms.  The Plan carefully defines "Workers' Compensation Benefits" and requires that Delta "shall" apply the Plan's definition.[83]

113.     Delta's interpretation of "Workers' Compensation Benefits" and related Plan provisions: 1) stands inconsistent with the goals of the Plan; 2) renders other language in the Plan meaningless and makes the Plan internally inconsistent;

---

[82] See Ex. 1 at ¶ 7.7(b).

[83] See id. at ¶ 1.2.32.

3) conflicts with ERISA; 4) stands inconsistent with its own prior interpretations of the Plan; and 5) runs contrary to the Plan's clear language.[84]

114.    The Plan's goal is to "help provide financial security in your retirement years."[85]  By reducing pension benefits contrary to the express terms of the Plan (and contrary to employees' justified expectations) based on discontinued pre-retirement receipt of workers' compensation benefits, Delta acted inconsistently with the Plan's purpose to provide retirement security to airline employees.

115.    Delta's interpretation renders multiple portions of Section 1.2.32 meaningless.  First, by seeking to offset pension benefits by one-time, lump sum workers' compensation benefits, it renders the term "periodic" meaningless in Section 1.2.32's reference to "periodic benefits payable."  Second, by seeking to offset pension benefits by workers' compensation benefits that have already been paid, it renders the term "payable" meaningless.  Third, by seeking to offset pension benefits by workers' compensation benefits that have been fully paid and discontinued (as confirmed and memorialized in the settlement agreements and subsequent notices delivered to Plaintiffs), Delta renders meaningless its

---

[84] See Peterson v. UnitedHealth Grp. Inc., 913 F.3d 769, 775-76 (8th Cir. 2019) (quoting Finley v. Special Agents Mut. Benefit Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992)).

[85] See Ex. 17 at 8; see also Hughes v. 3M Retiree Medical Plan, 281 F.3d 786, 790 (8th Cir. 2002) ("Summary plan descriptions are considered part of the ERISA plan document").

obligation to "determine[] and redetermine[]" the amount of benefits that the

Plan offsets, "to take into account the . . . discontinuance of such benefits."[86]

Lastly, by seeking to apply a broader definition of Workers' Compensation

Benefits than is provided in the Plan, Delta renders meaningless the Plan's

directive that defined terms "shall" have the meaning assigned to them within

the Plan.[87]

116.        Delta's interpretation renders the Plan's benefit-calculation provisions

internally inconsistent.  Section 3.1.2 states that: "The monthly amount of the

Participant's Normal Retirement Pension shall be such that together with

Workers' Compensation Benefits, if any, it will be the amount of the Participant's

Accrued Benefit determined as of the Participant's Termination of

Employment."[88]  This means that all normal-retirement participants receive

monthly benefits totaling their Accrued Benefit.  If a participant is

simultaneously entitled to monthly pension benefits *and* monthly Workers'

Compensation Benefits, both sources of money combine to equal the Accrued

---

[86] <u>See</u> Ex. 1 at ¶ 1.2.32.

[87] Ex. 1 at ¶ 1.2.

[88] <u>Id.</u> at ¶ 3.1.2.

Benefit: the pension benefits plus the Workers' Compensation Benefits ("together with") will equal the Accrued Benefit.

117.     By its terms, Section 3.1.2 guarantees participants benefits equaling the Accrued Benefit, but it divides the value of the Accrued Benefit between the pension source and the workers' compensation source.  For example, if a participant has an Accrued Benefit of $1000 per month and is also entitled to $200 per month in Workers' Compensation Benefits, she will only receive $1000 per month - $200 of Workers' Compensation Benefits and $800 of pension benefits: "together" they equal the Accrued Benefit.

118.     Section 3.2.2 describes a functionally identical system for the Early Retirement Pension: monthly pension benefits "shall be the amount of the Participant's Accrued Benefit determined as of the Participant's Termination of Employment," but at age 65, monthly payments "shall be reduced by the Workers' Compensation Benefits, if any, received by the Participant."[89] In other words, where an early-retirement participant simultaneously receives monthly pension benefits and monthly Workers' Compensation Benefits, when the participant turns 65, the Plan reduces the monthly pension benefits so that the total monthly benefits (pension benefits plus Workers' Compensation Benefits)

---

[89] Id. at ¶ 3.2.2.

equal the Accrued Benefit. In this way, Section 3.1.2 and 3.2.2 mirror each other at the time participants turn age 65.  Neither Section 3.1.2 nor Section 3.2.2 allows Delta to reduce participants' total monthly benefits below the Accrued Benefit.

119.     But what Delta is doing to Plaintiffs deviates from the Plan.  Under Sections 3.1.2 and 3.2.2, a participant always receives the full value of her Accrued Benefit, even if simultaneous Workers' Compensation Benefits get functionally absorbed.  However, Delta's unreasonable interpretation uses the Accrued Benefit as a *starting point*, not an *ending point*.  Delta starts with the Accrued Benefit and then subtracts the participant's previously received workers' compensation benefits, resulting in total monthly benefits significantly lower than the Accrued Benefit.  Using the same example of a participant who has an Accrued Benefit of $1000 per month, Delta's interpretation subtracts previously received workers' compensation benefits at $200 per month, to give the participant only $800 per month – 20% less than their Accrued Benefit.

120.     Delta's unreasonable interpretation renders 3.2.2 incompatible and inconsistent with 3.1.2 as soon as a participant turns age 65: under 3.1.2, normal-retirement participants are always guaranteed the full value of their Accrued Benefit, even if the source is divvied up between pension benefits and monthly Workers' Compensation Benefits; but under 3.2.2, early-retirement participants see their already-reduced Accrued Benefit (due to fewer years of vesting service)

*further* reduced by workers' compensation benefits that were paid and
discontinued years prior.

121.     There is no textual support for this severe outcome. The Plan language
demonstrates an intent to eliminate a potential windfall to participants by
ensuring that total benefits remain at, but do not exceed, the Accrued Benefit.
But Delta interprets the Plan to push beyond the elimination of a windfall, to
reduce Plaintiffs' benefits below the Accrued Benefit that the Plan promises.

122.     To the extent Delta suggests that Section 3.1.2 also authorizes its actions,
such interpretation renders Section 3.1.2's reference to "together with Workers'
Compensation Benefits" entirely meaningless.

123.     Delta's interpretation conflicts with ERISA.  "ERISA was enacted 'to
promote the interests of employees and their beneficiaries in employee benefit
plans,' and 'to protect contractually defined benefits.'"[90]  ERISA was "designed to
ensure the proper administration of pension and welfare plans" – which
axiomatically requires that pension plans be enforced pursuant to the terms
contained therein.[91]  By reducing the "contractually defined benefits" owed to

---

[90] <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 113 (1989) (internal citations omitted).

[91] <u>See</u> <u>Boggs v. Boggs</u>, 520 U.S. 833, 839 (1997).

employees in a manner contradicting the terms of the Plan, Delta's interpretation

conflicts with ERISA's policy purposes.

124.     Delta's interpretation of the Plan also conflicts with ERISA by advancing

Delta's own financial interests over the interests of Plan participants.  Delta's

interpretation significantly broadens the definition of Workers' Compensation

Benefits, resulting in a larger share of total benefits that are offset under the Plan.

And because workers' compensation benefits are paid in full or in substantial

part by third-party insurers, Delta effectively outsources its financial obligations

under the Plan and creates a windfall for itself: it saves a substantial amount of

money by reducing monthly benefits to Plan participants (below the Accrued

Benefit promised by the Plan, as discussed above), and it does so based on prior

lump sum settlements that were paid by third-party insurers instead of by Delta.

Delta's interpretation of the Plan advances its own financial interests at the

expense of Plaintiffs and similarly situated participants, contrary to ERISA's duty

of loyalty.[92]

---

[92] See 29 U.S.C. §§ 1104(a)(1), 1106(b)(1); see also Leigh v. Engle, 727 F.2d 113, 123 (7th Cir. 1984) (to satisfy ERISA's duty of loyalty, a plan fiduciary must "act with complete and undivided loyalty to the beneficiaries of the trust and with an eye single to the interests of the participants and beneficiaries." (internal quotation marks and citations omitted)); Peterson v. UnitedHealth Grp, Inc., 242 F. Supp. 3d 834, 845 (D. Minn. 2017) (deciding whether an action is in the best interests of plan participants "is not the same as deciding whether [the action] is in the best interests of the administrator itself"), aff'd 913 F.3d 769 (8th Cir. 2019).

125.     Additionally, Delta's interpretation of the Plan conflicts with ERISA by relying on guidance from an entity with adverse interests to Plan participants.  In its letters to Plaintiffs and its written decision on Plaintiffs' administrative appeals, Delta announced that it relied on guidance from its Workers' Compensation Department when pursuing its interpretation of the Plan. Because Plaintiffs and similarly situated Plan participants were involved in contested workers' compensation claims against Delta's Workers' Compensation Department, their interests are adverse to each other.  By soliciting and relying on interpretive guidance from the Workers' Compensation Department, Delta "wore two hats" when interpreting the Plan, contrary to its fiduciary duty under ERISA.[93]

126.     Delta's current interpretation of the Plan is inconsistent with prior interpretations.  A prior SPD plainly states: "Workers' Compensation Benefits payable to you before you are age 65 are disregarded."[94]  That language exempts all workers' compensation benefits received by Plaintiffs, since all were paid as

---

[93] See 29 U.S.C. § 1106(b)(2); see also Pegram v. Herdrich, 530 U.S. 211, 225 (2000) ("ERISA does require … that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions.").

[94] Ex. 23 at 9.

lump sums before they reached age 65.  Delta's current view is inconsistent with its view in the prior SPD.

127.     Delta's interpretation contradicts the Plan's clear language: a) defining Workers' Compensation Benefits as "*periodic* benefits payable"; b) defining Workers' Compensation Benefits as "periodic benefits *payable*"; c) requiring the redetermination of Workers' Compensation Benefits that are subject to offset to account for any "discontinuance" of such benefits; and d) explaining that Workers' Compensation Benefits "you *receive*" (not "have received") may be subject to offset.[95]  Contradiction with the plain language of a plan is the most significant factor when determining the unreasonableness of a plan's interpretation.[96]

---

[95] See Ex. 1 at ¶ 1.2.32; Ex. 17 at 18. See also generally Peterson v. United Health Group, 913 F.3d 769, 776 (8th Cir. 2019) (declining to "adopt[] a rule that anything not forbidden by the plan is permissible" and recognizing that, "[i]f . . . a practice was authorized by the plan documents, we would expect much clearer language to that effect").

[96] Janssen v. Minneapolis Auto Dealers Ben. Fund, 447 F.3d 1109, 1114 (8th Cir. 2006) ("Although we consider all of the factors, 'significant weight should be given to a misinterpretation of unambiguous language in a plan.'" (alteration omitted) (quoting Lickteig v. Bus. Men's Assurance Co. of Am., 61 F.3d 579, 585 (8th Cir. 1995))).

128.     An interpretation of a term is unreasonable if it doesn't conform with the ordinary meaning, "which can be derived from 'the dictionary definition of the word and the context in which it is used.'"[97]

129.     Merriam-Webster defines "periodic" as "occurring or recurring at regular intervals" or "occurring repeatedly from time to time."  Because Plaintiffs' workers' compensation benefits were paid on a one-time, lump sum basis, they did not "occur or recur" and did not "repeat from time to time."

### Synonyms & Antonyms for *periodic*

**Synonyms**
constant, frequent, habitual, periodical, regular, repeated, steady

**Antonyms**
inconstant, infrequent, irregular

[98]

130.     Merriam-Webster defines "payable" as something "that may, can, or must be paid."  It states that "paid" is the opposite of "payable."  Because Plaintiffs' workers compensation benefits were paid – i.e. their benefits were "cleared,"

---

[97] Kutten v. Sun Life Assur. Co. of Canada, 759 F.3d 942, 945 (8th Cir. 2014) (quoting Hutchins v. Champion Int'l Corp., 110 F.3d 1341, 1344 (8th Cir. 1997)).

[98] *Periodic,* https://www.merriam-webster.com/dictionary/periodic (last visited April 2, 2019).  Cf. Lao v. Hartford Life & Accident Ins. Co., 319 F. Supp. 2d 955, 960 (D. Minn. 2004) (finding that a plan's reference to "currently earning" is unambiguous and that the administrator's conflation of "earnings with receipts" is contrary to the plain language of the plan).

"paid up," and "settled" – they did not remain payable at the time Plaintiffs reached age 65.

## Synonyms & Antonyms for *payable*

### Synonyms

outstanding, overdue, owed, owing, unpaid, unsettled

### Antonyms

cleared, liquidated, paid (off *or* up), repaid, settled

[99]

131.    Further, Delta's interpretation fails to redetermine benefits to reflect whether they have been discontinued (by virtue of having been fully paid and satisfied).  This failure runs contrary to the plain language of Section 1.2.32, which provides that the Administrator "shall" redetermine the outstanding benefits and adjust the offset accordingly.

132.    In the Summary Plan Description, the Administrator says that it will offset pension benefits only for Workers' Compensation Benefits you "receive."[100]  By framing Workers' Compensation Benefits subject to offset in the present tense ("receive" instead of "receive or have received"), the Plan plainly allows the

---

[99] *Payable*, https://www.merriam-webster.com/dictionary/payable#examples, (last visited on April 2, 2019).

[100] Ex. 17 at 18.

offset only of those benefits that continue to be paid out after the age of 65 – not

benefits paid out and received prior to that age.

**Delta's decision to reduce Plaintiffs' benefits is not supported by substantial evidence.**

133.    Delta relied on five categories of documents when reaching its decision to

reduce Plaintiffs' monthly pension benefits: 1) Delta's original reduction letters;

2) Plaintiffs' administrative appeals; 3) Plaintiffs' follow-up letters regarding the

administrative appeals; 4) email correspondence with Delta's Workers'

Compensation Department, originating during the pendency of Plaintiffs'

administrative appeals; and 5) Plaintiffs' workers' compensation settlement

agreements.[101]

134.    Among the categories of documents that Delta considered, the workers'

compensation settlement agreements were the only evidentiary documents.  The

other categories consisted of Delta's interpretations and characterizations of the

Plan and the settlement agreements (the reduction letters and the

correspondence with the Workers' Compensation Department) and Plaintiffs'

arguments regarding those interpretations and characterizations (the

administrative appeal documents).

---

[101] See Ex. 12, 13, 14, 15, 16 at 1.

135.     As discussed above, the workers' compensation settlement agreements contain no reference to the Plan and do not purport to amend or alter the definitions contained within the Plan.

136.     Because the workers' compensation settlement agreements lack any connection to the Plan, they do not provide "substantial evidence" justifying Delta's reduction of Plaintiffs' monthly pension benefits.[102]  To the contrary, the workers' compensation settlement agreements contradict Delta's decision to reduce Plaintiffs' benefits by confirming that Plaintiffs received their workers' compensation benefits on a one-time, lump sum basis that discontinued any further entitlement to workers' compensation benefits.

137.     Plaintiffs appealed Delta's unreasonable and unsupported interpretation to the Administrative Committee and exhausted administrative remedies.[103]

138.     Delta denied Plaintiffs' appeals and invited them to sue.[104]

## CLASS ALLEGATIONS

139.     Plaintiffs bring their claims on behalf of a Class defined as:

---

[102] See Turna v. Mayo Clinic, 2019 WL 1643557, at *12 (D. Minn. Apr. 16, 2019) (concluding that a document that "says nothing" about its impact on an ERISA plan does not amount to "substantial evidence" supporting a determination of benefits).

[103] Ex. 7, 8, 9, 10, 11.

[104] Ex. 12, 13, 14, 15, 16.

All Plan participants and beneficiaries whose benefits have been or will be reduced by Delta on account of workers' compensation benefits paid and received before age 65, unless those participants' workers' compensation settlement agreements reflect an agreement to treat the paid and received benefits as "Workers' Compensation Benefits" defined in the Plan.

140.    The members of the Class are so numerous that joinder of all members is impractical.  While the precise number of members in the Class is known only to Delta, on information and belief, the Class consists of thousands of people.

141.    Common questions of law and fact that can be resolved with common answers exist as to all Class members and predominate over any questions affecting individual Class members.  Such common questions include:

a.   Whether Delta exceeded the bounds of its discretionary authority by attempting to interpret workers' compensation settlement agreements;

b.   Whether Delta unreasonably interpreted the Plan to deny benefits to Class members;

c.   Whether Delta's offsets constitute a breach of the Plan;

d.   Whether Delta's offsets are permitted under the plain language of the Plan;

e.   Whether Delta's standardized offset-related conduct establishes "deemed" exhaustion and futility of exhausting administrative remedies;

f.   Whether Class members may recover unpaid, reduced, and withheld benefits from Delta and, if yes, the amounts they should receive;

g.   Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

h. Whether Delta's decision to reduce Class members' benefits is supported by substantial evidence based solely on workers' compensation settlement agreements;

i. Whether Delta reduced Class members' benefits in pursuit of its financial self-interest and in breach of its fiduciary duties;

j. Whether Delta's reliance on another Delta department with an adverse interest to Class members amounts to a breach of its fiduciary duties;

k. Whether Class members are entitled to equitable restitution or other retroactive relief requiring Delta to relinquish the proceeds of its wrongdoing; and

l. Whether Class members are entitled to prospective relief enjoining Delta's offset practices.

142.    Plaintiffs' claims are typical of the claims of Class members because they are Plan participants whose benefits have been reduced or will be reduced by Delta on account of workers' compensation benefits previously paid and received.  Their workers' compensation settlement agreements did not include language reflecting Plaintiffs' agreement to treat their discontinued one-time, lump sum benefits as "Workers' Compensation Benefits" defined in the Plan.

143.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, are committed to vigorous prosecution of this action, and have retained competent and experienced attorneys to represent the Class.  Plaintiffs' attorneys have agreed to advance the costs of this action contingent upon the outcome and are aware that no fee can be awarded without the Court's approval.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

144.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendants.

145.    Delta likely has electronic records of when it offset benefit payments to Class members based on workers' compensation benefits previously paid and received.  Delta further has records of workers' compensation settlement agreements with Class members.  Therefore, the members of the Class may be readily and objectively ascertained through use of records maintained by Delta.

146.    By routinely reducing and withholding benefits owed on account of workers' compensation lump sum settlements, Delta has acted and refused to act on grounds that apply generally to the Class.  Adjudications by individual participants and beneficiaries regarding Delta's actions would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Fed. R. Civ. P. 23(b)(1)(A) or (B).

147.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable.  Moreover, because the benefits denied to Class members may be small relative to the expense and burden of individual litigation, it would

be impossible for Class members to individually redress the harm done to them.

Given the nature of the allegations, no Class member has an interest in

individually controlling the prosecution of this matter, and Plaintiff is aware of

no difficulties likely to be encountered in the management of this matter as a

class action. Alternatively, then, this action may be certified as a class under Fed.

R. Civ. P. 23(b)(3) if it cannot be certified under Fed. R. Civ. P. 23(b)(1)(A) or (B).

## COUNT 1
### Claim for Benefits Due

148.    Count 1 is brought under 29 U.S.C. § 1132(a)(1)(B).

149.    Delta systematically violates and violated the terms of the Plan and ERISA

by reducing pension benefit payments to Plaintiffs and Class members as

described above.

150.    Delta should be required to pay all such benefits.

## COUNT 2
### Claim for Injunctive, Declaratory, and Other Equitable Relief

151.    Count 2 is brought under 29 U.S.C. § 1132(a)(3).

152.    Delta systematically violates, violated, and will violate the terms of the

Plan and ERISA by reducing pension benefit payments to Plaintiffs and Class

members as described above.

153.    Delta systematically violates, violated, and will violate ERISA by

breaching its fiduciary duties to Plan participants. Delta made Plan decisions

in its own financial self-interest and at the expense of Plan participants, and

it solicited and relied on guidance from an entity with interests adverse to

Plaintiffs and Class members as described above.

154.    Delta should be enjoined from continuing to engage in this illegal

conduct and ordered to provide Plaintiffs and Class members with other

appropriate equitable relief, including but not limited to restitution of Delta's

ill-gotten gains.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

- Certify the Class and appoint Plaintiffs as Class Representatives and
  Plaintiffs' counsel as Class Counsel;

- Find and declare that Delta breached the Plan by offsetting lump sum workers'
  compensation benefits from pension benefits as described above;

- Find and declare that Delta breached its fiduciary duties under ERISA as
  described above;

- Order Delta to make payment, with interest, of benefits offset;

- Order Delta to disgorge profits earned by reducing benefits;

- Award actual monetary losses to Plaintiffs, similarly situated persons, and the
  Plan;

- Order equitable restitution and other appropriate equitable relief against

Delta;

- Order Delta to render an accounting;

- Surcharge against Delta and in favor of the Plan all amounts involved in transactions that such accounting reveals were or are improper, excessive, and/or in violation of ERISA;

- Enjoin Delta from offsetting benefits as described going forward;

- Enjoin Delta from further violations of its fiduciary responsibilities, obligations, and duties;

- Award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), the Common Fund doctrine, and/or other applicable ERISA provisions and common law;

- Order the payment of interest to the extent it is allowed by law; and

- Award such other and further relief as the Court deems equitable and just.


Dated: April 22, 2019                    **MADIA LAW LLC**

                                         s/J. Ashwin Madia
                                         J. Ashwin Madia, MN No. 0321187
                                         Zane Umsted, MN No. 0398761
                                         323 Washington Ave. N., Ste 200
                                         Minneapolis, MN 55401
                                         Telephone: 612.349.2743
                                         Fax: 612.235.3357
                                         Email: jamadia@madialaw.com
                                         **ATTORNEYS FOR PLAINTIFFS**